## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**(Alexandria Division)**

|  |  |
|---|---|
| **WILHELMINA REUBEN-COOKE** ) | |
| 11212 Hunting Horse Drive ) | |
| Fairfax Station, Virginia  22030 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **BOARD OF TRUSTEES OF THE** ) | |
| **UNIVERSITY OF THE DISTRICT** ) | |
| **OF COLUMBIA** ) | |
| 4200 Connecticut Avenue, N.W. ) | |
| Washington, D.C.  20008 ) | **AMENDED COMPLAINT** |
| ) | Civil Action No. 1:08cv1102 |
| Serve:  James W. Dyke, Jr., Chairman ) | Hon. Leonie M. Brinkema |
| Board of Trustees of the University ) | Hon. Ivan D. Davis |
| of the District of Columbia ) | |
| 4200 Connecticut Avenue, N.W. ) | |
| Washington, D.C. 20008 ) | |
| ) | |
| **EXAMINER.COM** ) | |
| 555 17th Street, Suite 700 ) | |
| Denver, Colorado 80202 ) | |
| ) | |
| Serve:  Richard M. Jones ) | |
| 555 17th Street, Suite 2400 ) | |
| Denver, CO  80202 ) | |
| ) | |
| **STANLEY JACKSON** ) | |
| 52 Brandywine Street, S.W. ) | |
| Washington, D.C. 20032 ) | |
| ) | |
| **WILMER L. JOHNSON** ) | |
| 3301 Beret Lane ) | |
| Silver Spring, Maryland  20906 ) | |
| ) | |
| **JOHNNIE A. LANDON, JR.** ) | |
| 4401-A Connecticut Avenue, N.W., #286 ) | |
| Washington, D.C.  20008 ) | |
| ) | |
| ) | |

**SYDNEY HALL**                                )
1431 Iris Street, N.W.                          )
Washington, D.C.  20012                         )
                                                )
**JONETTA ROSE BARRAS**                         )
1438 Meridian Place, N.W., #306                 )
Washington, D.C.  20010                         )
                                                )
**BILL MYERS**                                  )
4024 20th Street, North                         )
Arlington, Virginia  22207                      )
                                                )
**ANDREW HARNICK**                              )
3505 22nd Street, North                         )
Arlington, Virginia  22207                      )
                                                )
**BRUCE JOHNSON**                               )
3508 Halcyon Drive                              )
Alexandria, Virginia  22305                     )
                                                )
              Defendants.                        )
_____            )

## AMENDED COMPLAINT

WILHELMINA REUBEN-COOKE, by counsel, hereby moves this Court for

Judgment, against the BOARD OF TRUSTEES OF THE UNIVERSITY OF THE

DISTRICT OF COLUMBIA, STANLEY JACKSON, WILMER L. JOHNSON,

JOHNNIE LANDON, SYDNEY HALL, EXAMINER.COM, JONETTA ROSE

BARRAS, BILL MYERS, ANDREW HARNIK and BRUCE JOHNSON, jointly and

severally, and in support thereof, states as follows:

1.      This is a civil action arising out of defamation and defamation *per se*,

unequal pay, tortious interference with contractual relations and business expectancies,

common law civil conspiracy, conversion, negligent retention and intentional infliction of

emotional distress, by defendants THE BOARD OF TRUSTEES OF THE UNIVERSITY

OF THE DISTRICT OF COLUMBIA, STANLEY JACKSON, WILMER JOHNSON,

2

JOHNNIE LANDON, SYDNEY HALL, EXAMINER.COM, JONETTA ROSE

BARRAS, BILL MYERS, ANDREW HARNIK and BRUCE JOHNSON in the course

of, and in the termination of, plaintiff Wilhelmina Reuben-Cooke.

      2.    This action also alleges tortious interference with contractual relations and

business expectancies against the individual defendants, Stanley Jackson, Wilmer L.

Johnson and Johnnie Landon, and defamation against the defendants Stanley Jackson,

Wilmer L. Johnson, Johnnie Landon, Sydney Hall, Jonetta Rose Barras, Bill Myers,

Andrew Harnik and Bruce Johnson.  The claim of defamation is also brought against the

The Board of Trustees of the University of the District of Columbia and Examiner.com

under the doctrine of *respondeat superior*.  The claim of intentional infliction of

emotional distress is brought against all defendants.

      3.    This action also states a federal claim against The Board of Trustees of the

University of the District of Columbia under the Equal Pay Act, 29 U.S.C. § 206(d).

## **PARTIES**

      4.    Plaintiff, Wilhelmina Reuben-Cooke ("Ms. Reuben-Cooke"), is a resident

and citizen of Fairfax County in the Commonwealth of Virginia.

      5.    Defendant, The Board of Trustees of the University of the District of

Columbia ("UDC"), is the governing body for the University of the District of Columbia.

      6.    Defendant Stanley Jackson ("Mr. Jackson") is a resident and citizen of

Washington D.C. and at all times relevant hereto was the Acting President of UDC.

      7.    Mr. Jackson was Chief Operating Officer, effective July 1, 2007, and

subsequently Acting President of UDC, until September 1, 2008, at which time he was

replaced by the Board of Trustee's permanent appointment of Dr. Allen L. Sessoms as President of UDC.

8.     Defendant Wilmer L. Johnson ("Dr. Johnson") is a resident and citizen of the state of Maryland. Dr. Johnson was the acting Provost and a candidate for the position at the time Ms. Reuben-Cooke was selected as the permanent Provost for UDC.

9.     Defendant Johnnie Landon ("Mr. Landon") is a resident and citizen of Washington, D.C.

10.     Defendant Sydney Hall ("Dr. Hall") is a resident and citizen of Washington D.C.

11.     Defendant Examiner.com, also known as Clarity Digital Group, LLC, is a Foreign Limited Liability Company with a place of business in Denver, Colorado. Examiner.com operates the Examiner.com website, an online news publication that is accessible all over the United States, including the Examiner.com website specific to the Washington DC/Northern Virginia metropolitan area, which is accessible to, and read by, readers in the Commonwealth of Virginia.

12.     The Examiner.com's online articles are posted by individuals, called Examiners, in the local publication area who purport to "examine their topics from an insider's perspective and share their knowledge, insight and useful information with others looking to get a 'local's' take."  Examiner.com's home website pages tout the Examiner.com's online posts as "more than opinion" and "filled with credible" news and interviews.

13.     Defendant Jonetta Rose Barras ("Ms. Barras") is a resident and citizen of Washington, D.C, and regularly contributes news stories to Examiner.com.

4

14.     Defendant Bill Myers ("Mr. Myers") is a resident and citizen of the Commonwealth of Virginia and regularly contributes news stories to Examiner.com.

15.     Defendant Andrew Harnik ("Mr. Harnik") is a resident and citizen of the Commonwealth of Virginia and regularly contributes news stories to Examiner.com.

16.     Defendant Bruce Johnson ("Mr. B. Johnson") is a resident and citizen of the Commonwealth of Virginia and regularly contributes news stories to Examiner.com.

17.     This Court has jurisdiction over Ms. Reuben-Cooke's claims under 28 U.S.C. § 1332(a).

## JURISDICTION AND VENUE

18.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

19.     Some of the tortious acts and causes of action alleged to have been engaged in, as well as the resultant injury, were committed in the Commonwealth of Virginia.

20.     UDC is present in, and regularly conducts business in, a state other than the District of Columbia.

21.     UDC is present in, and regularly conducts affairs and business activities, and has substantial contacts with, the Commonwealth of Virginia.

22.     UDC is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2), (3), & (4).

23.     Stanley Jackson is a resident of Washington, D.C., and was employed as the Acting President of UDC in Washington, D.C., and has substantial contacts with and in the Commonwealth of Virginia.

5

24.     Wilmer Johnson is a resident of the state of Maryland and was employed by UDC.  Dr. Johnson has substantial contacts with and in the Commonwealth of Virginia.

25.     Johnnie Landon is a resident of the District of Columbia, and was employed by UDC.  Mr.  Landon has substantial contacts with and in the Commonwealth of Virginia.

26.     Mr. Jackson, Dr. Johnson and Mr. Landon are subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2), & (3).

27.     Examiner.com is Foreign Limited Liability Company with a place of business in Denver, Colorado.  Examiner.com operates the Examiner.com website, an online news publication that is accessible all over the Commonwealth of Virginia and specifically purports to report local news about Virginia and the DC Metropolitan area.

28.     By Examiner.com's own admission, its Examiners' postings reach "thousands," including in this judicial district.

29.     Examiner.com is present in and regularly conducts affairs and business activities in the Commonwealth of Virginia.

30.     Examiner.com is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2), (3), & (4).

31.     Bill Myers is a resident and citizen of the Commonwealth of Virginia, and contributed news stories to Examiner.com which were accessible to and read by readers in the Commonwealth of Virginia.

32.     Andrew Harnik is a resident and citizen of the Commonwealth of Virginia, and contributed news stories to Examiner.com which were accessible to and read by readers in the Commonwealth of Virginia.

33.     Bruce Johnson is a resident and citizen of the Commonwealth of Virginia, and contributed news stories to Examiner.com which were accessible to and read by readers in the Commonwealth of Virginia.

34.     Injury to Ms. Reuben-Cooke, as well as aspects of the tortious acts committed by defendants, occurred in this judicial district.

35.     Venue over Ms. Reuben-Cooke's common law claims is proper under Va. Code §§ 8.01-262(1), (2), (3), (4) and (10).

36.     Venue over Ms. Reuben-Cooke's claims is proper in this Court.

## BACKGROUND

37.     Prior to joining UDC and after over 30 years in the fields of law and higher education, Ms. Reuben-Cooke enjoyed a distinguished career in the education community, laden with accolades and commendations.

38.     Ms. Reuben-Cooke served as the Associate Director at the Institute for Public Representation at Georgetown University Law Center.  After that, in 1986, she taught at Syracuse University College of Law, where she achieved the rank of Full Professor with tenure, and became the Associate Dean for Academic Affairs in 1992.

39.     Ms. Reuben-Cooke's many honors include election to Phi Beta Kappa at Duke University as one of the first five Black students admitted as an undergraduate to Duke University.  Ms. Reuben-Cooke was a Ph.D. student at Harvard University as a Woodrow Wilson Scholar, and attended the University of Michigan School of Law as a

John Hay Whitney Fellow.  Among other awards, Ms. Reuben- Cooke was inducted into the Syracuse University Chapter of the Order of the Coif, and was awarded the Sojourner Truth Award from the Syracuse University Chapter of The National Association of Negro Business and Professional Women's Clubs, the C. Eric Lincoln Distinguished Alumni Award from the Duke University Black Alumni Council, and the Black Citizens for a Fair Media Annual Award for Public Interest Advocacy.

40.     Ms. Reuben-Cooke was elected to the Duke University Board of Trustees in 1989, becoming the first Black woman to serve on Duke's Board of Trustees and served in leadership positions, including the Executive Committee of the Board.  In 2006, Ms. Reuben-Cooke was appointed by Duke University's President to co-chair the Presidential Council, a group formed to review Duke's responses to the wide-reaching, significant issues raised by the "lacrosse incident," and to advise the President and Trustees.

41.     Ms. Reuben-Cooke accepted the executive appointment as Provost and Vice President for Academic Affairs of UDC, effective July 16, 2003.  In this position, Ms. Reuben-Cooke reported directly to the then-President of UDC, William L. Pollard ("Dr. Pollard").

42.     Upon her acceptance of the position, Ms. Reuben-Cooke's offer letter, as presented, also awarded her the academic rank of Professor, with tenure, in the University of the District of Columbia David A. Clarke School of Law.  The faculty of the David A. Clarke School of Law unanimously voted to award Ms. Reuben-Cooke an appointment as a tenured full Professor, and she held a faculty appointment in addition to her executive appointment as Provost.

8

43.     However, the details of Ms. Reuben-Cooke's offer letter became known, including the provision for a $10,000 signing bonus, and because of the public controversy, the contract was revised to rescind the offer of a signing bonus.

44.     Ms. Reuben-Cooke's original offer from Dr. Pollard also included the provision that upon termination of the executive appointment of Provost, Ms. Reuben-Cooke would revert to her faculty position, allowing her to take a sabbatical or administrative leave in the event she stepped down from her position as Provost.

45.     The publicity surrounding Ms. Reuben-Cooke's contract led to several reiterations and eventually Dr. Pollard asked Ms. Reuben-Cooke to "just accept a clean, lean contract," so they could "move through the storm," stating that adjustments could, and would, be made later.

46.     The controversy surrounding Ms. Reuben-Cooke's hiring stemmed from allegations that because her "earned doctorate" was a J.D. rather than a Ph.D., she did not possess the academic credentials for the job and that she was hired solely because of Dr. Pollard's personal connections to her and her husband, Edmund Cooke.

47.     However, Ms. Reuben-Cooke's name was forwarded to Dr. Pollard, together with two other candidates including the then-Acting Provost, Wilmer Johnson, only after extensive interviews with members of the search committee and other constituencies of the University community.  Moreover, Ms. Reuben-Cooke possessed a Juris Doctorate and a level of educational experience which was more diverse and equal to or exceeding that of the other viable candidates.  Ms. Reuben-Cooke was selected for hire based upon her credentials and her record of academic leadership at Syracuse University and other venues.

9

48.     On February 6, 2004, the Office of Campaign Finance, D.C. Board of Elections and Ethics, dismissed a complaint alleging that President Pollard "extended favorable treatment to [Ms. Reuben-Cooke] when he hired her as UDC Provost and Vice President of Academic Affairs because she is a friend and former colleague."[1]

49.     In an lengthy opinion with extensive findings of fact and conclusions of law, the D.C. Board of Elections and Ethics found that Ms. Reuben-Cooke's name was forwarded to Dr. Pollard "because she was the best qualified, after its review thereof through the Committee process" and the hiring and "initial compensation packages, which may have included a $10,000 bonus, a tenured position at UDC David A. Clarke School of Law, or any other awards or incentives, is solely within the discretion of respondent as UDC President, as allowed by 8 D.C.M.R. 210.5." (*Id.*)

50.     The salary and bonus originally offered to Ms. Reuben-Cooke were offered in an attempt to keep her salary and benefits at least comparable to her salary and benefits as a Professor at Syracuse University, and to approach that of her male counterparts, and to appropriately align her salary as Provost with that of the President.

51.     Despite the controversy, at all times relevant hereto, Ms. Reuben-Cooke performed her job duties in an exemplary manner, garnering praise as an effective administrator.

52.     There was no standard written performance review at UDC, but Dr. Pollard provided positive verbal performance reviews of Ms. Reuben-Cooke and expressed that he was pleased with the progress she was making.

---

[1] *In the Matter of Dr. William L. Pollard, President, University of the District of Columbia*, Docket No. Investigation 03-03, February 6, 2004.

53.     During her tenure as Provost at UDC, Ms. Reuben-Cooke was responsible for the accreditation renewal for all of the University's existing accredited programs. Significantly, the Middle States Commission on Higher Education renewed the University's accreditation "with commendation."

54.     Significant new accreditations for the University occurred during Ms. Reuben-Cooke's leadership as Provost.  Specifically, the David A. Clarke School of Law received full ABA accreditation, and the National Council for the Accreditation for Teacher Education accreditation, and accreditation for UDC's child care center were accomplished.  Ms. Reuben-Cooke also created the position of Associate Provost for Faculty Professional Development, Student Retention, and International Affairs, she instituted a Faculty Development Program which also included staff, and initiated a student retention program.

55.     Ms. Reuben-Cooke significantly expanded international programs, outreach and opportunities for faculty and staff, and she supported and developed a cadre of faculty to develop on-line instruction.  Ms. Reuben-Cooke revived faculty summer research grants and initiated a faculty incentive grant program.  Ms. Reuben-Cooke also commenced an academic affairs strategic planning process.

56.     The above are just some, but not all, of Ms. Reuben-Cooke's significant achievements and contributions to UDC during her tenure as Provost.

57.     On June 29, 2007, Ms. Reuben-Cooke spoke with Dr. Pollard to bring closure to a number of matters, among them asking that he confirm their mutual understanding that, as customary in higher education, Ms. Reuben-Cooke would be granted an administrative leave or sabbatical leave in the event she stepped down as

11

Provost.  Dr. Pollard requested that she send him an email to that effect, which she did. Dr. Pollard did not reply.

58.     On June 30, 2007, Dr. Pollard's Presidency was terminated.  The Board of Trustees was responsible for appointing an Acting President until a permanent replacement could be found.  Dr. Pollard's termination was viewed as a forced resignation.

59.     Although it is customary for the Provost to step in as Acting President during Presidential transitions, the Board of Trustees appointed Stanley Jackson, the then-Senior Vice President and Chief of Staff, who had no experience in matters pertaining to higher education prior to joining UDC in January 2007, as Chief Operating Officer effective July 1, 2007, and subsequently as Acting President

60.     Subsequent to his appointment as COO and Acting President, Mr. Jackson continued a practice of verbal abuse, severe criticism, threats, and use of profane language in meetings with senior executive staff appointed by Dr. Pollard.

61.     In August 2007, the newly-appointed Acting President, Stanley Jackson informed Ms. Reuben-Cooke that he had directed the Assistant General Counsel, Carlynn Fuller ("Ms. Fuller"), to take an active role in representing the Office of the President in the planning and activities associated with Faculty Professional Development Day.

62.     In the years past, Faculty Professional Development Day, for returning and new faculty, had always been carried out under the auspices of the Academic Affairs department, with brief welcome remarks by the President.

63.     At the time of Mr. Jackson's directive, planning of the event had been on-going for months and the draft agenda had been shared with Mr. Jackson and others on August 6, 2007.

64.     At the time of Mr. Jackson's directive, Mr. Jackson also made false accusations and representations about the Office of the Provost, regarding not contacting the speakers for the event, despite being informed to the contrary.

65.     Mr. Jackson's overall tone towards the Associate Provost, Dr. Bertha Minus, who was sitting in the Executive Cabinet meeting for Ms. Reuben-Cooke, was inappropriate, unprofessional, demeaning and threatening.  Mr. Jackson's attitude was intended to, and did, undermine Ms. Reuben-Cooke's authority and challenged the competency of her staff.

66.     Although Ms. Reuben-Cooke attempted to speak with Mr. Jackson directly about these matters, he was unavailable; so she, therefore, wrote a detailed memorandum to Mr. Jackson outlining and responding to each of his concerns as shared with her by the Associate Provost, and offering to discuss with him any concerns he had about the quality or content of the planned program.  She also expressed concern generally about his demeanor toward senior staff and his use of threats and profanity.

67.     Ms. Reuben-Cooke told Mr.  Jackson she would not finalize the agenda for the event until they had an opportunity to talk through the matters together.

68.     In the meeting in which the University General Counsel, David Watts, was present, Mr. Jackson was visibly upset by Ms. Reuben-Cooke's memorandum and his conduct and tone were unprofessional and intimidating.  Mr. Jackson told Ms. Reuben-

Cooke, "You are nothing to me!  You are not the last thing I think about before I go to sleep at night or the first thing I think about when I wake up.  You are nothing to me!"

69.     Mr. Jackson also commented to Ms. Reuben-Cooke several times during the course of the meeting, "I don't know if we can work together."

70.     On September 27, 2007, the UDC Senate, an elected advisory board, sent a letter to District of Columbia Mayor Adrian Fenty, asking for Ms. Reuben-Cooke's termination, alleging misappropriation of funds and preferential treatment based upon her personal relationship with the Dr. Pollard.  On information and belief, this action was not approved by the vote of the entire Senate membership as required by the Senate By-laws.

71.     During October 2007, the Examiner.com online newspaper published a series of articles which made false statements about UDC and about Ms. Reuben-Cooke, personally.  Examiner.com attributed all of the false statements to "unnamed sources."

72.     Specifically, on October 22, 2007, Jonetta Rose Barras wrote an article implying that Ms. Reuben-Cooke's decision to not fully implement the workforce development project was "baffling" and unprofessional, and alleging mismanagement of funds leading to the $18 million projected surplus.

73.     On October 23, 2007, Examiner.com reporter Bruce Johnson published an article entitled, "Troubled UDC Returns Millions to City Treasury."  The article alleged that $18 million was being returned to Washington, D.C. because the money was not spent prior to the end of FY2007 which ended on September 30, 2007.

74.     Examiner.com reporter Bill Myers filed a story the same day, implicating Ms. Reuben-Cooke in this mismanagement, stating that although Dr. Pollard had been fired, his "command staff" was still in place, and that the University Senate had already

14

demanded the termination of Ms. Reuben-Cooke and a thorough review of UDC's finances.

75.    On October 24, 2007, an article entitled "Top D.C. university official mishandled millions," by Andrew Harnik, Bill Myers and Jonetta Rose Barras as contributor, accused Ms. Reuben-Cooke of doling "out hundreds of thousands of dollars in no-bid contracts to friends," stating that she was under local and federal investigation.

76.    The article charged that Ms. Reuben-Cooke, with her "nearly unlimited authority over millions of dollars," improperly handled a "$3.6 million job-training grant . . . and sat on millions in federal funds until they had to be given back …."  Simply quoting "sources," the article further stated that Ms. Reuben-Cooke diverted the funds from this grant, spending "most of it on lavish receptions and on 'entertainment.'"

77.    In reality, Mr. Jackson had authority over the money, not Ms. Reuben-Cooke.

78.    On October 25, 2007, Examiner.com published an article entitled, "The University of D.C. is ripe for reform," by Jonetta Rose Barras ("Ms. Barras").

79.    Ms. Barras' article alleged that Edmund Cooke presented Dr. Pollard as a candidate for UDC President, and then had his wife, Ms. Reuben-Cooke, hired as Provost based upon the close personal relationship between the Cookes and the Pollards.

80.    Ms. Barras cited the fact that Ms. Reuben-Cooke had never served as a vice president of academic affairs before in her career as proof of the improper appointment, while completely ignoring Ms. Reuben-Cooke's background in the educational field as detailed in ¶¶ 38-40, above.  The article referred to UDC as being "saddled with … a clueless academic officer."  Ms. Barras alleged that, after Dr. Pollard

15

was fired, UDC was left with "a one woman wrecking industry," referring to Ms. Reuben-Cooke. The article cited ambiguous allegations of financial mismanagement, and concluded by advocating for the termination of Ms. Reuben-Cooke.

81.     On October 26, 2007, Mr. Jackson, in his capacity as Acting President of UDC, issued a public statement calling the media reports from the last several days "inaccurate."

82.     Mr. Jackson also stated that it was too early, and any comment or conclusions regarding FY2007 spending would be premature since the books for FY2007 closed on September 30, 2007.

83.     On October 29, 2007, Examiner.com reporter Bill Myers, with the assistance of Ms. Barras, published an article entitled, "UDC leaders request staff shake-up." The article summarized an "exclusive interview" with Mr. Jackson and Board of Trustees Chairman James Dyke, Jr. ("Mr. Dyke"), stating that university officials acknowledged the financial mismanagement and planned to overhaul staffing in those areas. The article made reference to an effort to "clean up years of mismanagement and abuse at the university," including the unspent funds previously attributed to Ms. Reuben-Cooke.

84.     The allegations made about Ms. Reuben-Cooke in each of the Examiner.com articles were false and constituted defamation.

85.     Dr. Sydney Hall, President of the University Senate, republished and disseminated the defamatory statements by sending the articles via email to the University community.

86.     Mr. Jackson perpetuated the defamation in an interview with Examiner.com, referring to the need to "clean up years of mismanagement and abuse at the university," including the unspent funds previously attributed to Ms. Reuben-Cooke.

87.     While it is true that some of the funds attributed to the teacher training grant were unspent or were carried over to the next fiscal year, it was because the professors who ran the grant were not able to train as many teachers as allowed for under the grant, and the grant came to the University after the initial grant period had started. Moreover, the Principal Investigators on the grant filed the appropriate reports with the funding agency, the Department of Education.

88.     In her capacity as Provost, Ms. Reuben-Cooke prepared several requests to Dr. Pollard, who referred them to Mr. Jackson, to use the excess tuition and lapsing funds in Academic Affairs for other Academic Affairs purposes, but most of her requests were denied.

89.     Because of the false and defamatory articles posted by Examiner.com, Ms. Reuben-Cooke began receiving lewd, vicious and profane emails.  One said, "when the fuck are you going to step down, you corrupt, inept, bitch?"  Another read, "hope you are in church today, you bitch.  when [sic] you waste and selfishly mis-use money intended to help people less fortunate, you are guaranteed a place in Hell.  talk [sic] your way out of that one, you dirty cunt."

90.     On Monday, November 19, 2007, Ms. Reuben-Cooke was called into Mr. Jackson's office.  David Watts ("Mr. Watts"), UDC's General Counsel, was also present.

91.     Mr. Jackson began the meeting by informing Ms. Reuben-Cooke that the university would be "moving in another direction."  In support of his decision to

17

terminate Ms. Reuben-Cooke, Mr. Jackson made reference to the recent Examiner.com

articles about Ms. Reuben-Cooke, the upcoming hearing before the City Council

regarding the University, and the recent publicity surrounding the tax scandal in D.C.

Government, which was one of his prior places of employment.

92.     When queried by Ms. Reuben-Cooke, Mr. Jackson told Ms. Reuben-

Cooke that he did not believe the allegations against Ms. Reuben-Cooke in the

Examiner.com articles, but a recent meeting on Workforce Development did raise

questions about the initiative.

93.     Ms. Reuben-Cooke pointed out that she had informed him in their August

2007 meeting that she had an executive appointment and therefore served at the pleasure

of the President.

94.     Mr. Jackson said that he wanted to be able to inform Chairman Vincent

Gray at the upcoming D.C. Council hearing of this personnel decision.

95.     Ms. Reuben-Cooke protested, indicating that this was a personnel decision

and that it was inappropriate to air it in a publicly televised meeting venue.  Ms. Reuben-

Cooke further stated that she would not have her professional reputation undermined and

besmirched in such fashion.  Mr. Jackson quickly represented that he would not do so,

but asked if he could privately inform Chairman Gray of the change prior to the hearing.

Ms. Reuben-Cooke agreed.

96.     On November 20, 2007, Ms. Reuben-Cooke received an email from Mr.

Watts giving her a 2:00 p.m. same day deadline to advise him of her requests regarding

her separation.  Ms. Reuben-Cooke responded by email that same day, requesting that

UDC honor her original agreement with Dr. Pollard, allowing her to take a one year paid

sabbatical, returning to the classroom in Fall 2008. Ms. Reuben-Cooke also requested that she be allowed to remain in her position until the end of the semester for a smoother transition.

97.     Mr. Watts responded, stating that he wanted to move forward, and asked if Ms. Reuben-Cooke would negotiate her position if there were "issues." Ms. Reuben-Cooke requested clarification of what "issues" might arise so that she could consult with her legal counsel. Mr. Watts responded the next day, stating only, "I am looking at a letter of appointment."

98.     Mr. Watts was aware of Ms. Reuben-Cooke's strongly stated desire to take a sabbatical or administrative leave pursuant to the terms of her original acceptance letter with Dr. Pollard.

99.     On November 22, 2007 (Thanksgiving Day), Ms. Reuben-Cooke's aunt died and the funeral was scheduled for November 27, 2007 in South Carolina. Therefore, Ms. Reuben-Cooke was not able to attend the hearing as previously planned.

100.    Despite his representations to the contrary, at the hearing before the D.C. City Council on November 27, 2007, Mr. Jackson, during exchanges with Chairman Gray and Councilman Barry, made several representations impugning Ms. Reuben-Cooke's integrity, competency and professionalism.

101.    For example, in a discussion with Chairman Gray regarding delays in constructing the Student Disability Center and getting needed information, Mr. Jackson said that the "people responsible for that may not be with us much longer." At the time he made this remark, Mr. Jackson was aware Ms. Reuben-Cooke was not responsible for

delaying the construction of the proposed disability center or failing to providing timely information.

102.     Also, in an exchange with Councilman Barry regarding inappropriate spending of $3.6 million in workforce development funds, Mr. Jackson indicated that he was sufficiently concerned as to order an investigation by the Inspector General's Office. Mr. Jackson further stated that the "bottom line was in the Provost's office," implying poor management and the absence of reasonable oversight and management. Councilman Barry repeated Mr. Jackson's contention that the bottom line was the Provost's office and blamed the problem on gross mismanagement.  Mr. Jackson concurred with this statement.

103.     In responding to questions regarding the failure to spend money for the build-out of PR Harris, Mr. Jackson identified the Office of the Provost as the responsible party.  When asked about the Provost's response to the failure to complete the build-out, Mr. Jackson responded, "Candidly [she said] it was not [her] responsibility … someone else [was assigned.]"  This response by Mr. Jackson conveyed that Ms. Reuben-Cooke was irresponsible and unprofessional.  Mr. Jackson knew as early as January or February that Mr. Landon, who had previously been Special Assistant to Dr. Pollard, had been assigned responsibility for the build-out and that President Pollard had conveyed that responsibility to him in his position as Chief of Staff/Senior Vice President.

104.     Additionally, in an exchange with Chairman Gray regarding the Woodson High School satellite program, Mr. Jackson represented that there would not be a program in place until January 2008, instead of October 1, 2007.  At the time he made

20

this statement, Ms. Reuben-Cooke had already informed Mr. Jackson that a limited

program was in place with expansion targeted for January 2008.

105.    Finally, despite his representation that he would not discuss Ms. Reuben-

Cooke's termination during the Council proceeding, Mr. Jackson repeatedly spoke about

"having the right academic leadership," "right sizing the academic side of the house," and

"working out details [of Ms. Reuben-Cooke's termination] with counsel."  He also made

reference to "changes" that would be made in the "next week to ten days."

106.    Mr. Jackson's remarks about Ms. Reuben-Cooke at the hearing were false

and constituted defamation.

107.    On December 7, 2007, Stanley Jackson, on behalf of the University of

Columbia, sent Ms. Reuben-Cooke a letter terminating her Executive Appointment as

Provost and Vice President, Academic Affairs, effective immediately.  The letter further

stated that she would be paid on administrative leave until January 15, 2008.

## COUNT ONE –
## DEFAMATION AND DEFAMATION *PER SE*
### (against all Defendants)

108.    The foregoing allegations are incorporated as if realleged herein

109.    Defendants made false and defamatory statements about Ms. Reuben-

Cooke to thousands of Examiner.com readers by providing the statements to, and/or

posting the statements on, Examiner.com.  These comments led readers to believe that

Ms. Reuben-Cooke had mismanaged and misappropriated millions of dollars at the same

time that UDC was implementing a tuition increase due to lack of funds.  The defamatory

statements are further set forth above.  These statements were patently and demonstrably

false, constituted fact or factually laden opinion which can be substantially proven false, and constituted defamation or defamation *per se*.

110.    In addition, these statements were repeated and published to thousands upon thousands of people, in the public domain.  These statements constitute defamation or defamation *per se*.

111.    These repeated references, both private and public, that Ms. Reuben-Cooke had mismanaged and misappropriated millions of dollars suggested that she was dishonest, not competent to continue serving UDC in her position as Provost and committed criminal misconduct.  Furthermore the references to Ms. Reuben-Cooke receiving the executive appointment to Provost based on her personal relationship with the then-President Dr. Pollard suggested that Ms. Reuben-Cooke did not possess the credentials, qualifications and experience to hold the position.  These allegations were made despite the fact that the Office of Campaign Finance, D.C. Board of Elections and Ethics had specifically found to the contrary in a public opinion.

112.    Further, the articles suggested that Ms. Reuben-Cooke was forced to resign under controversial and suspicious circumstances, and that she was no longer considered to be honest or competent to perform the job responsibilities such a position required, and should not be seriously considered as a legitimate, competent candidate in comparable positions.

113.    The false statements that Ms. Reuben-Cooke had mismanaged and misappropriated millions of dollars were made in an attempt to justify forcing Ms. Reuben-Cooke to resign.

114.    Defendants made these materially false and misleading statements about Ms. Reuben-Cooke as set forth above, knowing the claims were false, defamatory and outrageous and incendiary, particularly in the context of the conduct and communications.

115.    These statements were made with the intent of, and had the effect of, injuring Ms. Reuben-Cooke in her reputation and trade, prematurely cutting her effective working career and signaling to those in the comparable workforce that Ms. Reuben-Cooke was no longer competent, capable and honest enough to hold such positions.

116.    Any privilege connected to these statements was waived because (a) Defendants knew these statements were false or made these statements with reckless disregard as to whether the statements were false or not; (b) the statements were unnecessarily insulting; (c) the language used was stronger or more violent than was necessary under the circumstances; and/or (d) the statements were made because of malice, hatred, ill will or a desire to injure or irreparably injure Ms. Reuben-Cooke, rather than a fair comment on the subject.

117.    Defendants' defamatory statements were also published to third parties in the form of news articles posted on Examiner.com, available to thousands upon thousands of readers.

118.    Some of Mr. Jackson's defamatory statements were also made during a TV broadcast of a hearing before the D.C. City Council on November 27, 2007.

119.    These defamatory statements were made, in part, for the purpose of justifying Mr. Jackson's decision to terminate Ms. Reuben-Cooke based upon false

allegations, and to avoid the obligations created by Dr. Pollard's promises and representations.

120.    There was no factual information to support the defamatory statements.

121.    These materially false and misleading statements were made with the intent to harm, and did harm, Ms. Reuben-Cooke's reputation, integrity and competency in her employment and profession.

122.    Such comments and actions served to permanently damage Ms. Reuben-Cooke's reputation in the eyes of UDC and the higher education community.

123.    The statements and conduct by the Defendants also imply that Ms. Reuben-Cooke was unfit to perform the duties of her employment.  The effect of Defendants' words was prejudicial to Ms. Reuben-Cooke in her reputation and her work.

124.    Defendants' conduct and statements constituted defamation *per se*.

125.    The conduct of Defendants was malicious, wanton and evinced a willful and conscious disregard for Ms. Reuben-Cooke's rights and reputation, perpetuated and condoned by the highest officials of UDC and Examiner.com, and further was accomplished in a reckless and grossly negligent manner.

126.    As a direct and proximate result of the defamation, Ms. Reuben-Cooke has suffered and will in the future suffer great damages, including loss of income, loss of employee benefits, lost career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, damaged personal and professional reputation, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

127.    Due to the severity and malice of Defendants' defamatory conduct, Ms. Reuben-Cooke is also entitled to punitive damages.

## COUNT TWO -
## TORTIOUS INTERFERENCE WITH CONTRACTUAL
## RELATIONS AND BUSINESS EXPECTANCIES
### (against Stanley Jackson)

128.    The foregoing allegations are incorporated as if realleged herein.

129.    Ms. Reuben-Cooke was a highly respected professional in her field, and the recipient of numerous honors and awards.  Ms. Reuben-Cooke received numerous accolades and had many accomplishments at UDC.  Ms. Reuben-Cooke had every reason to believe she would remain in her position as Provost and Vice President for Academic Affairs until the appointment of a new President of the University.

130.    In the alternative, Ms. Reuben-Cooke possessed a business expectancy with UDC, having every reason to believe that if she stepped down from her position as Provost and Vice President for Academic Affairs, that the terms of her original letter of acceptance with Dr. Pollard would be honored, especially since it is customary in higher education to grant such leave for a senior administrator returning to a faculty appointment.

131.    Based upon the terms and compensation of Ms. Reuben-Cooke's employment with UDC, which includes factors for education and experience, Ms. Reuben-Cooke was entitled to be paid at Grade 02, Step 15, a salary of $98,681.00.

132.    Mr. Jackson, who was aware of Ms. Reuben-Cooke's contractual relations and business expectancies, and while acting outside the scope of his employment, employed improper means to interfere with Ms. Reuben-Cooke's contractual relations and business expectancies with UDC.

25

133.    Mr. Jackson employed improper methods to interfere with Ms. Reuben-Cooke's contractual relations and business expectancies.  The "improper means" includes, but is not limited to, intentionally interfering with Ms. Reuben-Cooke's compensation, conspiring to injure Ms. Reuben-Cooke's reputation, portraying Ms. Reuben-Cooke in a false and defamatory light, claiming that Ms. Reuben-Cooke mismanaged and/or misappropriated money when in fact she did not, treating Ms. Reuben-Cooke in a hostile and disrespectful manner, encouraging insubordination, spreading false and misleading information, and engaging in deception and dishonesty in his dealings with Ms. Reuben-Cooke, and with others in their communications respecting Ms. Reuben-Cooke.

134.    But for Mr. Jackson's interference, Ms. Reuben-Cooke would enjoy continued employment at UDC, and would continue to realize the business expectancies as set forth in this Complaint.  Alternatively, Ms. Reuben-Cooke would have realized the contractual terms earlier promised by Dr. Pollard.

135.    As a direct and proximate result of the tortious interference, Ms. Reuben-Cooke has suffered and will suffer in the future great damages, including loss of reputation, loss of her Executive Appointment as Provost and Vice President, Academic Affairs, loss of income, loss of retirement benefits, loss of employment benefits, lost career and business opportunities and advancement, other past pecuniary losses, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, stress, pain, suffering, loss of enjoyment of life and other nonpecuniary injury.

136.    Due to the severity of defendants' conduct, Ms. Reuben-Cooke is also entitled to punitive damages.

26

## COUNT THREE –
## COMMON LAW CONSPIRACY
### (against Stanley Jackson, Wilmer Johnson, Johnnie Landon and Sydney Hall)

137.   The foregoing allegations are incorporated as if realleged herein.

138.   Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall conspired with each other, and with others, to cause financial and emotional distress and loss, as well as to cause injury to Ms. Reuben-Cooke's reputation.

139.   Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall conspired to disseminate false information about Ms. Reuben-Cooke.

140.   Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall conspired with each other, and with unnamed co-conspirators, to cause Ms. Reuben-Cooke great emotional distress, frustration, inconvenience, damage to her reputation, and financial harm.

141.   The acts of conspiracy constituted improper methods, which included spreading false and misleading information to paint Ms. Reuben-Cooke in a false and vicious light, defamation (repeatedly making materially false statements about Ms. Reuben-Cooke and portraying her in a false light), and such conduct was engaged in for an unlawful purpose.

142.   The concerted actions of Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall were willful, intentional and malicious, evinced a conscious disregard for the rights of Ms. Reuben-Cooke, were aimed specifically and maliciously at causing damage to Ms. Reuben-Cooke, and did cause Ms. Reuben-Cooke injury and damage.

143.   As a direct and proximate result of the conduct of Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall, Ms. Reuben-Cooke has suffered and will suffer in the future great damages, including emotional and mental anguish, stress, pain, damage to

her reputation, frustration, humiliation, inconvenience, depression, a sense of betrayal, isolation and profound injustice, loss of enjoyment of life, unnecessary and prolonged litigation and expenses associated with the conduct, loss of income/monetary amounts, and interest on monetary amounts.

144.    Due to the severity of Defendants' conduct, Ms. Reuben-Cooke is also entitled to punitive damages.

## COUNT FOUR – CONVERSION
### (against UDC)

145.    The foregoing allegations are incorporated as if realleged herein.

146.    Ms. Reuben-Cooke possessed the right and title to her full compensation while at UDC.  The full compensation constituted property of Ms. Reuben-Cooke.

147.    UDC tortiously interfered with Ms. Reuben-Cooke's right and title, exercising wrongful control and assumption of authority over the full compensation due to Ms. Reuben-Cooke, and monies due Ms. Reuben-Cooke, thereby depriving Ms. Reuben-Cooke of possession of her full compensation, which was in denial of Ms. Reuben-Cooke's property and inconsistent with Ms. Reuben-Cooke's right to the property.

148.    Such conduct was engaged in by UDC with malice, ill-will and a conscious disregard for the rights of Ms. Reuben-Cooke.

149.    As a result of such conversion, Ms. Reuben-Cooke has suffered damages, including lost income, interest and loss of use of the income, inconvenience, embarrassment and emotional distress.

150.    In addition, Ms. Reuben-Cooke is entitled to recover punitive damages from UDC for the conversion of her property rights.

**COUNT FIVE–**
**VIOLATION OF THE EQUAL PAY ACT**
**(against UDC)**

151.    The allegations of the foregoing paragraphs are incorporated as if

realleged herein.

152.    UDC paid Ms. Reuben-Cooke as Provost, a lower salary than that of men

performing equal work under similar working conditions, the performance of which

required substantially equal skill, effort, and responsibility.

153.    Specifically, Stanley Jackson was hired at a substantially higher salary,

without justification, for a title of less rank and no prior higher education experience.

154.    The lower compensation paid to Ms. Reuben-Cooke was on account of her

gender, female, and not unequal due to a seniority system, a merit system, a system

which measured earnings by quantity or quality of production, or a differential based on

any factor other than gender.

155.    UDC's failure to provide Ms. Reuben-Cooke with equal pay was willful

and persisted throughout her tenure as Provost.

156.    As a direct and proximate result of the unequal pay, and UDC's specific

illegal acts, Ms. Reuben-Cooke has suffered and will suffer in the future great damages,

including loss of income, litigation expenses including attorneys' fees, and other past

pecuniary losses.

157.    Because the UDC's conduct was willful, Ms. Reuben-Cooke is entitled to

the full amount of damages recoverable under the Equal Pay Act, 29 U.S.C. § 206, et

seq., including, but not limited to compensatory damages, liquidated damages in an

amount equal to the compensatory damages and attorney fees and costs as described in 29 U.S.C. § 216(b).

**COUNT SIX -**
**<u>NEGLIGENT RETENTION OF EMPLOYEE</u>**
**(against UDC)**

158.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

159.     UDC had a duty to its employees, including Ms. Reuben-Cooke, not to retain employees whom they knew or should have known were dangerous and likely to harm their employees, or to place them in positions of supervision over other employees.

160.     UDC had actual and/or constructive knowledge that Mr. Jackson was engaging in conduct that was harmful to Ms. Reuben-Cooke and was likely to continue to harm her.  More specifically, UDC was aware, or should have been aware, of Mr. Jackson's efforts to discredit and defame Ms. Reuben-Cooke and to take adverse action against Ms. Reuben-Cooke.

161.     Despite this knowledge, UDC retained Mr. Jackson as an employee with supervisory authority over Ms. Reuben-Cooke.

162.     UDC placed Ms. Reuben-Cooke in a position where Mr. Jackson had supervisory authority over her and failed to warn or protect employees, including Ms. Reuben-Cooke, from Mr. Jackson.

163.     Mr. Jackson's actions were taken to justify Ms. Reuben-Cooke's termination from her position as Provost of UDS.

164.     UDC was negligent in its supervision and retention of Mr. Jackson after it learned, or should have learned, that Mr. Jackson was harming Ms. Reuben-Cooke,

treating her in an unfair and unjustified manner, defaming her, and subjecting Ms. Reuben-Cooke to adverse employment actions.

165.    Had UDC properly supervised and/or properly removed Mr. Jackson from the workplace, Mr. Jackson would not have had the opportunity to defame and discredit Ms. Reuben-Cooke, and he would not have had the opportunity to conspire against and further harm Ms. Reuben-Cooke.

166.    UDC's supervision and retention of Mr. Jackson and its failure to protect Ms. Reuben-Cooke from Mr. Jackson, was willful and wanton, in that it exhibited a conscious disregard for the rights of Ms. Reuben-Cooke.  UDC exhibited a reckless indifference in its failure to protect Ms. Reuben-Cooke, and in retaining Mr. Jackson as Acting President with supervisory authority over Ms. Reuben-Cooke.  UDC was aware that its failure to act to protect Ms. Reuben-Cooke by retaining Mr. Jackson would most likely result in harm to Ms. Reuben-Cooke.

167.    UDC's retention of Mr. Jackson in the face of knowledge of his actions against Ms. Reuben-Cooke, coupled with taking no action to properly investigate, or to warn or protect employees, including Ms. Reuben-Cooke, from Mr. Jackson, and placing employees, including Ms. Reuben-Cooke, in positions where they were supervised by Mr. Jackson, constituted gross negligence and evinced a conscious disregard for the rights of Ms. Reuben-Cooke.

168.    As a direct and proximate result of UDC's actions, Ms. Reuben-Cooke has suffered and continues to suffer injury, physical and emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement,

medical expenses, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

169.    Due to the severity of UDC's conduct, Ms. Reuben-Cooke is also entitled to punitive damages.

**COUNT SEVEN -**
**<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>**
**(against all Defendants)**

170.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

171.    The conduct of the Defendants was intentional or reckless in that the defendants had the specific purpose of inflicting emotional distress on Ms. Reuben-Cooke, fully intended their conduct, and knew or should have known that severe emotional distress would likely result.

172.    UDC is responsible and liable for the intentional and reckless conduct of Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall because they committed these acts either in the course and scope of their employment or agency with UDC, or in the alternative, they acted outside the scope, but UDC ratified their conduct.  UDC knew, or should have known, that Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall had a propensity to engage in this conduct and more serious conduct, and ultimately condoned, ratified and joined in their conduct.

173.    Examiner.com is responsible and liable for the intentional and reckless conduct of Ms. Barras, Mr. Myers, Mr. Harnik and Mr. B. Johnson because they committed these acts either in the course and scope of their employment or agency with Examiner.com, or in the alternative, they acted outside the scope, but Examiner.com

ratified their conduct by publishing or posting the articles. Examiner.com knew, or should have known, that Ms. Barras, Mr. Myers, Mr. Harnik and Mr. B. Johnson had a propensity to engage in this conduct and more serious conduct, and ultimately condoned, ratified and joined in their conduct.

174.    The actions and conduct of the defendants, as set forth above, were intentional or reckless in that they had the specific purpose of inflicting emotional distress on Ms. Reuben-Cooke, fully intended their conduct, and knew or should have known that severe emotional distress would likely result.

175.    Defendants' conduct was outrageous and intolerable in that it offends generally accepted standards of decency and morality.

176.    Furthermore, UDC gave Mr. Jackson, Dr. Johnson Mr. Landon and Dr. Hall implied and express authority to engage in this conduct by permitting the continuation of a working environment in which this type of activity was allowed to occur.

177.    Examiner.com gave Ms. Barras, Mr. Myers, Mr. Harnik and Mr. B. Johnson implied and express authority to engage in this conduct by permitting the continuation of a working environment in which this type of activity was allowed to occur.

178.    UDC later ratified the conduct of Mr. Jackson, Dr. Johnson, Mr. Landon and Dr. Hall by refusing to take effective remedial action in response to the false information published about Ms. Reuben-Cooke and her performance, and instead furthering the abuse inflicted upon Ms. Reuben-Cooke.

179.    Examiner.com ratified the conduct of Ms. Barras, Mr. Myers, Mr. Harnik and Mr. B. Johnson by publishing and disseminating false information about Ms. Reuben-Cooke and her performance, thereby furthering the abuse inflicted upon Ms. Reuben-Cooke.

180.    As a direct result of the behavior of all defendants towards Ms. Reuben-Cooke, Ms. Reuben-Cooke has suffered severe emotional distress with physical manifestations, which has at times rendered her incapable of functioning in her day-to-day activities and responsibilities.  Such physical manifestations include, but are not limited to, markedly higher blood pressure requiring medical attention, depression, stress, insomnia, significant stomach ailments, inability to focus and think clearly, and other physical, psychological and physiological maladies.

181.    This conduct by defendants was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregard for the rights of Ms. Reuben-Cooke.

182.    As a proximate result of defendants' conduct, Ms. Reuben-Cooke has suffered and continues to suffer severe emotional distress.

183.    UDC continued to refuse to address the false information being disseminated by UDC and by Examiner.com about Ms. Reuben-Cooke.

184.    As a direct and proximate result of the defendants' actions, Ms. Reuben-Cooke has suffered and continues to suffer severe emotional distress and physical injury, including panic attacks.  Such injury includes pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

185.   Due to the severity of defendants' conduct, Ms. Reuben-Cooke is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff WILHELMINA REUBEN-COOKE requests that this Court enter judgment in her favor, and against Defendants, BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA on Counts Four, Five and Six; against STANLEY JACKSON on Counts Two and Three; against WILMER L. JOHNSON, JOHNNIE LANDON, SYDNEY HALL on Count Three; and against all Defendants, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA, STANLEY JACKSON, WILMER JOHNSON, JOHNNIE LANDON, SYDNEY HALL, EXAMINER.COM, JONETTA ROSE BARRAS, BILL MYERS, ANDREW HARNIK and BRUCE JOHNSON, jointly and severally, on Counts One and Seven and further:

(a)   Award Ms. Reuben-Cooke compensatory damages to be determined by a jury, and in no event to exceed Ten Million Dollars ($10 million), plus demonstrated past and future pecuniary damages on each of the above-stated Counts One through Seven and in addition;

(b)   Award Ms. Reuben-Cooke punitive and exemplary damages to be determined by a jury, but restricted by the statutory cap of $350,000.00; and

(c)   Award Ms. Reuben-Cooke such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

PLAINTIFF WILHELMINA REUBEN-COOKE DEMANDS A TRIAL BY

JURY.


November 21, 2008                    Respectfully submitted,

                                     */s/ KATHLEEN Z. QUILL*

                                     _____
                                     Elaine Charlson Bredehoft
                                     ebredehoft@cbc-law.com
                                     Virginia Bar No. 23766
                                     Kathleen Z. Quill
                                     kquill@cbc-law.com
                                     Virginia Bar No. 66323
                                     CHARLSON BREDEHOFT & COHEN, P.C.
                                     11260 Roger Bacon Drive, Suite 201
                                     Reston, Virginia 20190
                                     (703) 318-6800 Phone
                                     (703) 318-6808 Facsimile

                                     Counsel for Plaintiff,
                                       Wilhelmina Reuben-Cooke